UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| JODY L. KOCH | ) | |
| (Social Security No. XXX-XX-4187), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:11-cv-133-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 9, 13) and an Order of Reference entered by Chief Judge Richard L. Young on January 19, 2012 (Docket No. 14). The Magistrate Judge conducted a hearing in this matter on June 5, 2012. Steve Barber appeared on behalf of Plaintiff, while Thomas E. Kieper and John Martin appeared on behalf of the Commissioner.

### I. Statement of the Case

Plaintiff, Jody L. Koch, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f). The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on April 13, 2009, alleging disability since January 1, 2008.  (R. 100-08).  The agency denied Plaintiff's application both initially and on reconsideration.  (R. 65-68, 73-79).  Plaintiff appeared and testified at a hearing before Administrative Law Judge Stuart T. Janney ("ALJ") on November 5, 2009.  (R. 33-62).  Plaintiff was represented by an attorney; also, a vocational expert ("VE") testified.  (R. 33).  On December 23, 2009, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past work.  (R. 16-29).  After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 1-3).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on October 25, 2011, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on March 10, 1959, Plaintiff was 50 years old at the time of the ALJ's decision, with a J.D. degree.  (R. 29, 37-38).  Her past relevant work experience included work as an attorney.  (R. 39).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

On January 3, 2007, Plaintiff visited Anne McLaughlin, M.D., who specializes in allergy and immunology; Plaintiff had a history of allergic rhinitis and chronic sinusitis.  (R. 199-200).  Plaintiff was not currently having any symptoms of sinusitis or asthma.  Plaintiff's lab work previously showed a low

titer to diphtheria and an indeterminate titer to tetanus, with positive antibodies to four types of strep pneumonia, but a negative response to all others.  In addition, Plaintiff's white blood cell count and neutrophil count were low.  (R. 199).  Dr. McLaughlin was concerned about the "low-ish white blood count with low neutrophil count" and noted that Plaintiff "did not have much response to diphtheria or tetanus."  Dr. McLaughlin was seeking an explanation for Plaintiff's recurrent sinus infections.  Dr. McLaughlin ordered vaccinations for tetanus/diphtheria/pertussis, as well as Pneumovax, and planned to measure Plaintiff's titer levels post vaccination.  She also ordered a re-measure of Plaintiff's white blood count, neutrophil count, and monocyte count to see if there were any changes from recent tests.  (R. 199).  Plaintiff's lab work was taken on February 2, 2007.  (R. 250-51).

On February 16, 2007, Dr. McLaughlin saw Plaintiff for a follow-up.  (R. 201).  In the time since Plaintiff's January visit, Plaintiff had received vaccinations for tetanus, diphtheria and pneumococcus, and blood had been collected and tested to determine whether her body had produced antibodies in response to those vaccinations.  (R. 201).  Lab results showed that Plaintiff did not produce antibodies in response to diphtheria, but the remainder of the lab results were still not back yet.  (R. 201).  On that date, Plaintiff also had symptoms of a sinus infection.  (R. 201).  She also continued "to be quite frustrated with her lack of energy and always feeling ill."  (R. 201).

On March 6, 2007, Plaintiff again visited Dr. McLaughlin for a review of her lab results regarding a possible immune system deficiency.  (R. 203-04).

Plaintiff reported experiencing a lot of recent fatigue.  Dr. McLaughlin noted that on two occasions Plaintiff's immunoglobulins had not responded to immunization.  (R. 203).  Dr. McLaughlin diagnosed specific antibody deficiency which she explained was consistent with Plaintiff's complaints of fatigue and chronic sinus infections; she recommended a trial of intravenous immunoglobulin ("IVIG") therapy for six months to see if it would better control Plaintiff's symptoms and keep her sinus infections under better control.  (R. 203).

Plaintiff visited Dr. McLaughlin to receive her first IVIG treatment on April 10, 2007.[1]  (R. 205).  It was noted that Plaintiff was undergoing the treatment because her antibodies do not mount an appropriate functional response.  She tolerated the procedure well and was told to return in four weeks for her next infusion.  (R. 205).

On May 10, 2007, Plaintiff returned for her second IVIG treatment with Dr. McLaughlin.  (R. 206).  Plaintiff felt that she had experienced increased energy after the first treatment, and she had experienced no sinus infections.  It was noted that, in addition to the IVIG treatment, she was on allergy immunotherapy as well, which was causing her some problems.  (R. 206).

---

[1]The records indicate that an IVIG therapy session lasts in excess of four or five hours.  (R. 302-05).  Plaintiff contends that the infusions are exhausting and that she spends the remainder of the day and night of her treatment sleeping.  (R. 120). The treatment cost over $41,000 per year, and, because there is no cure for an immune deficiency, this will be an annual cost as long as Plaintiff continues her treatment. (R. 120).  Plaintiff also receives allergy shots on at least a bi-weekly basis (R. 212), which means that Plaintiff visits Dr. McLaughlin's clinic three times each month (one time for infusions and two additional times for allergy shots).  (R. 212).

At Plaintiff's IVIG treatment session on June 7, 2007, she reported still being somewhat fatigued, but she had no sinusitis.  (R. 209).

On September 5, 2007, and October 3, 2007, Plaintiff visited Dr. McLaughlin for IVIG treatment and reported that she had experienced a cold, but that she had not developed sinusitis.  (R. 212-13).

At Plaintiff's IVIG treatment session on December 4, 2007, Plaintiff reported to Dr. McLaughlin that she had not experienced any bouts of sinusitis and had experienced increased energy; she was also sleeping well at night and her allergy shots were going well.  (R. 216).

On February 28, 2008, Dr. McLaughlin reported that Plaintiff had a problem with dog saliva.  (R. 221).  Her family got a new dog and the dog licked Plaintiff's face causing eye swelling and redness.  (R. 221).  An antihistamine treatment resolved this problem.  (R. 221).

On May 29, 2008, Dr. McLaughlin commented that Plaintiff was on IVIG treatment; she was late in getting an infusion one month, and since that time she had experienced some increasing problems with fatigue.  (R. 226).  Plaintiff had not had a sinus infection since her last visit.  (R. 226).  Plaintiff's IVIG treatment session on June 24, 2008, resulted in a similar observation by Dr. McLaughlin.  (R. 227).  However, by her IVIG treatment session on July 22, 2007, she was experiencing increased energy again.  (R. 229).

On September 16, 2008, at Plaintiff's IVIG treatment session, Dr. McLaughlin again reported that Plaintiff had not had any sinus infections and that her allergies were well-controlled.  (R. 232).  However, Dr. McLaughlin also

noted that Plaintiff was still having problems with fatigue, which was worse over the last two weeks.  (R. 232).

Again, on October 14, 2008, Plaintiff reported to Dr. McLaughlin that she was still having problems with fatigue, which was worse over the last several weeks.  Dr. McLaughlin noted that Plaintiff felt exhausted by 1:00 p.m. each day and was ready for a nap; she keeps herself awake during the week, but she sometimes takes a six-hour nap on the weekends.  (R. 236).

On November 13, 2008, Dr. McLaughlin reported no fevers, but Plaintiff had some recent post-nasal drainage and felt more exhausted.  (R. 238).  According to Dr. McLaughlin, Plaintiff had an upcoming appointment with an acupuncturist, and she was changing primary care physicians.  (R. 238).

Plaintiff reported still dealing with exhaustion and drainage every day at her IVIG treatment session on December 11, 2008.  (R. 243).  She had been to see an acupuncturist, but she did not find this helpful.  She also was seeing a new primary care doctor.  (R. 243).

At Plaintiff's IVIG treatment sessions on January 8, 2009, February 5, 2009, March 5, 2009, and April 2, 2009, Plaintiff reported still having problems with chronic fatigue.  (R. 244-46, 249).

Plaintiff visited Mark Graves, M.D., on March 12, 2009, to establish a relationship with a new primary care physician.  (R. 192-97).  Plaintiff complained of fatigue, immune deficiency, and depression.  (R. 192)  Plaintiff complained of chronic fatigue which had lasted for six to ten years and which caused her to barely function at home and required taking naps for most of the

day.  Plaintiff reported that she was tried on antidepressants, which did not help, and that her treatment for immune deficiency also had not helped.  (R. 192).  Dr. Graves noted that Plaintiff's laboratory data appeared normal except that it showed that she had been exposed to the Epstein-Barr virus, which, though not a specific cause, might be consistent with chronic fatigue syndrome. (R. 192).  Plaintiff indicated that her depression stemmed from her being tired and her inability to do activities that she would like to do.  (R. 192).  Dr. Graves recommended a sleep study before placing Plaintiff on medication for idiopathic chronic fatigue syndrome.  (R. 192).

On April 30, 2009, Plaintiff saw Dr. McLaughlin's partner, Majed Koleilat, M.D., who reported that since Plaintiff's last visit, she had not experienced any fevers, sinus infections, pneumonia, or skin infections.  (R. 291).  Plaintiff reported significant fatigue.  (R. 291).

On a follow-up with Dr. Graves on May 11, 2009, Plaintiff continued to be fatigued and was having difficulty falling asleep.  (R. 293-94).  The sleep study had been difficult, and she had difficulty falling asleep.  (R. 293).  The results of the sleep study were not yet available, so Dr. Graves only prescribed mineral supplements and set another six-week follow-up.  (R. 293).  At that time, Dr. Graves was considering prescribing Adderall, but this would require an EKG and the purchase of a BP kit.  (R. 293).

On May 19, 2009, Plaintiff saw Jeffrey W. Gray, Ph.D., for a mental status examination.  (R. 260-63).  Plaintiff noted that Dr. McLaughlin identified her problem and that she had been able to eliminate Plaintiff's sinus infections.  (R.

260).  Plaintiff did report that she still had some trouble concentrating.  (R. 260).
Dr. Gray's mental status examination showed that Plaintiff functioned in the
above average range, and she had not experienced any significant intellectual
decline from premorbid levels.  Dr. Gray saw no clear signs that depression or
anxiety had affected these findings.  From a daily living perspective, Plaintiff
commented that her activities varied greatly depending on her fatigue level.  (R.
261).  She took part in her children's school activities, but did few household
chores.  (R. 261-62).  Dr. Gray opined that Plaintiff's emotional status was
unremarkable, but that she was experiencing depression.  (R. 262).  Dr. Gray
suggested that Plaintiff's primary symptom was fatigue, and he noted that the
fatigue was related to her immunoglobulin deficiency, rather than to her
depression, and it was not unlike the fatigue that is seen in multiple sclerosis
patients.  (R. 262).  From a strictly psychological perspective, Dr. Gray stated
that Plaintiff could handle work-like stresses, be fairly reliable and independent,
remember simple work rules, and handle simple problems.  (R. 262).  Dr. Gray
rated Plaintiff's Global Assessment of Functioning at 70.  (R. 263).

At Plaintiff's IVIG treatment session on May 28, 2009, Dr. McLaughlin
reported that Plaintiff had not had any fevers or sinus infections since her last
visit.  (R. 295).  She continued to have problems with stress in her life and with
increasing fatigue.  (R. 295).  Plaintiff had increased her dose of Paxil, and she
did not have the results from her sleep study.  (R. 295).

Plaintiff met with sleep specialist Faheem Abbasi, M.D., on June 17, 2009,
for a follow-up to the sleep study.  (R. 297-98).  Though the study showed no

evidence of sleep apnea, Plaintiff's sleep efficiency was only 73.2%, and Plaintiff only slept 368 minutes. The abnormal things noted by Dr. Abbasi were her latency to sleep onset which was 38 minutes and the latency of REM sleep which was 110.5 minutes. (R. 297). Both of these values are higher than expected. (R. 297). His assessment was that the sleep study itself was normal, but there was evidence of "sleep onset insomnia" as evidenced by a high sleep latency and high REM latency. (R. 297). A Sleep Center physician, Sultan Niazi, M.D., found that there were 272 leg movements, consistent with periodic limb movement disorder, which is "severe." (R. 306-07). Dr. Abbasi recommended Lunesta as a sleep aid, but he did not think either Ritalin or Adderall was indicated. (R. 297). Dr. Abbasi suggested that Provigil might be a consideration if Plaintiff continued with daytime sleepiness, because of its limited addictive potential and its favorable side effects, as opposed to Ritalin or Adderall. (R. 297).

On June 25, 2009, Plaintiff saw Dr. McLaughlin for an IVIG treatment session and indicated that Lunesta seemed to be helping her. Dr. McLaughlin reported no sinus infections since Plaintiff's last visit. (R. 299).

On July 16, 2009, Dr. Abbasi reported that Plaintiff had responded "very well" to Lunesta, and she was sleeping much better. (R. 321). According to this report, Plaintiff did not feel tired, lethargic, or run down in the morning. (R. 321). Dr. Abbasi's assessment was sleep onset insomnia that was very well controlled with Lunesta. (R. 321).

Plaintiff also saw Dr. Koleilat on July 16, 2009, for another IVIG treatment session. (R. 322-23). Since her last visit, Plaintiff had not experienced any

fevers, sinus infections, pneumonias, or skin infections.  Plaintiff continued to report a significant amount of fatigue that she attributed to her depression, which was driven by her social situation, as well as some of her trouble sleeping.  (R. 322).

On August 13, 2009, Dr. McLaughlin reported that Plaintiff had not had any sinus infections since her last office visit.  (R. 324-25).  Plaintiff indicated that her IVIG treatment helped to control her episodes of sinusitis.  It was noted that Plaintiff would pretreat with prednisone the day before, day of, and day after her IVIG treatment.  (R. 324).

On September 1, 2009, Plaintiff saw Dr. Graves for a follow-up and evaluation of several chronic medical problems.  (R. 326-27).  Plaintiff related new concerns about her fatigue, noting that she was still having difficulty managing her day-to-day activities.  (R. 326).  Dr. Graves suggested three medications, and Plaintiff chose Provigil.  (R. 326).

Plaintiff saw Dr. McLaughlin for her usual IVIG therapy session on September 10, 2009.  (R. 328-29).  Dr. McLaughlin stated that there had been no sinus infections, and Plaintiff's symptoms did not interfere with her sleep or daily activities.  (R. 328).

On October 8, 2009, Dr. McLaughlin again reported that there had been no sinus infections, and Plaintiff's symptoms did not interfere with her sleep or daily activities.  (R. 330-31).

On October 21, 2009, Dr. McLaughlin addressed a letter to Plaintiff's representative noting that Plaintiff had asked her to discuss Plaintiff's social

security claim.  (R. 335).  Dr. McLaughlin explained that she treated Plaintiff for problems with chronic sinusitis, allergic rhinitis, and a specific antibody deficiency.  According to Dr. McLaughlin, Plaintiff satisfied the criteria for an immune deficiency disorder because she received IVIG infusions every four weeks and because she had sinusitis that was resistant to treatment.  (R. 335). Dr. McLaughlin noted that the sinusitis was very difficult to treat with multiple courses of antibiotics and other sinus medications until Plaintiff started IVIG treatment.  (R. 335).  Dr. McLaughlin also reported repeated manifestations of an immune disorder with severe fatigue and malaise and limitations in completing tasks in a timely manner due to deficiencies in concentration, persistence, and pace.  (R. 335).

       After the ALJ's decision, Plaintiff submitted another letter from Dr. McLaughlin to the Appeals Council.  It reiterated Dr. McLaughlin's opinions from October 21, 2009, and explained that Plaintiff has experienced both severe fatigue and malaise.  Dr. McLaughlin stated:

> She also has marked limitation in completing activities of daily living.  She is unable to help her children with homework, do the dishes, or complete the laundry.  This is caused both by her inability to concentrate as well as her physical limitations due to fatigue.  She has a frequent sense of exhaustion and takes naps on most days.
>
> After treating Jody for several years for her medical conditions, and not seeing any improvement in her severe fatigue or malaise, it is my opinion that she is unable to engage in substantial gainful work.

(R. 337).

## 2.  State Agency Review

On June 3, 2009, state agency reviewing psychologist, J. Gange, Ph.D., completed a Psychiatric Review Technique Form.  (R. 264-77).  Dr. Gange opined that Plaintiff did not have a severe mental impairment.  (R. 264).  Plaintiff had mild impairment in activities of daily living; mild difficulties maintaining social functioning, mild problems with concentration, persistence, and pace; and no episodes of decompensation.  (R. 274).  On July 16, 2009, William A. Shipley, Ph.D., affirmed Dr. Gange's assessment.  (R. 315).

On June 4, 2009, A. Dobson, M.D., a state agency reviewing physician, completed a Physical Residual Functional Capacity Form.  (R. 278-85).  Dr. Dobson opined that Plaintiff could lift ten pounds occasionally and less than ten pounds frequently, and could stand/walk for two hours and sit for six hours in an eight-hour workday.  (R. 279).  Plaintiff could never climb ladders, ropes, or scaffolds, but could perform all other postural activities occasionally.  (R. 280).  Dr. Dobson recommended that Plaintiff avoid concentrated exposure to extremes of heat and cold, and she avoid hazards including unprotected heights.  (R. 282).  Dr. Dobson also indicated that the record did not contain a medical source statement that assessed Plaintiff's physical capabilities.  (R. 284).  On July 21, 2009, Richard Wenzler, M.D., affirmed Dr. Dobson's assessment.  (R. 320).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *see also Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson*, 402 U.S. at 399-400. Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that

meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through March 31, 2013; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date.  (R. 18).  The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had four impairments that are classified as severe:  (1) immune deficiency; (2) history of chronic sinusitis controlled with infusions; (3) allergic rhinitis; and (4) depression.  (R. 18).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 18).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 22-28).  Consequently, the ALJ concluded that Plaintiff retained the following RFC:  lift/carry/push/pull ten pounds occasionally and less than ten pounds frequently; stand/walk for two hours and sit for six hours in an eight-hour workday; occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme cold or heat and hazards such as unprotected

-14-

heights; and must work in an environment that is not stringently performance or quota-based.  (R. 21).  The ALJ opined that Plaintiff retained the RFC to perform her past work as an attorney as it was actually performed.  (R. 28).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 29).

## VI.  Issues

Plaintiff has essentially raised three issues.  The issues are as follows:

1.  Whether Plaintiff's immune deficiency disorder meets or substantially equals Listing 14.07A or 14.07C.

2.  Whether the ALJ's RFC assessment took into consideration all of Plaintiff's limitations.

3.  Whether the ALJ mischaracterized the VE's testimony.

**Issue 1:      Whether Plaintiff's immune deficiency disorder meets or substantially equals Listing 14.07A or 14.07C.**

In this case, Plaintiff first argues that the ALJ erred in finding that her immune deficiency disorder did not meet or substantially equal Listing 14.07.  Plaintiff claims that her immune deficiency disorder does, in fact, meet either Listing 14.07A or 14.07C, which provide as follows:

14.07  Immune deficiency disorders, excluding HIV infection.  As described in 14.00E.  With:

A.  One or more of the following infections.  The infection(s) must either be resistant to treatment or require hospitalization or intravenous treatment three or more times in a 12-month period.

1.  Sepsis; or

2.  Meningitis; or

3.  Pneumonia; or

-15-

4.  Septic arthritis; or

5.  Endocarditis; or

6.  Sinusitis documented by appropriate medically acceptable imaging.

or

* * * * *

C.  Repeated manifestations of an immune deficiency disorder, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1.  Limitation of activities of daily living.

2.  Limitation in maintaining social functioning.

3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 14.07.  In order for an

individual to be disabled under a particular listing, the impairment must meet

each distinct element within the listing.  *Rice v. Barnhart*, 384 F.3d 363, 369

(7th Cir. 2004).  And, it is important to remember that at step three, the burden

rests on Plaintiff to demonstrate that she meets the listing.

In his decision finding Plaintiff not disabled, the ALJ concluded that

Plaintiff did not meet Listing 14.07A because her last documented sinus

infection occurred prior to her alleged onset date and prior to being diagnosed

with and treated for an immune deficiency disorder.  (R. 19).  The ALJ explained

that while Plaintiff underwent intravenous treatment (the IVIG therapy), the

treatment was not actually for sinusitis, but it was for the immune deficiency

disorder instead.  Furthermore, the ALJ determined that Plaintiff could not

-16-

satisfy Listing 14.07A because there were no imaging studies documenting Plaintiff's sinusitis.  (R. 19).

Listing 14.07A does require a showing of immune deficiency disorder coupled with one of six specific types of infections.  According to Listing 14.00A(3), an immune deficiency disorder is "characterized by recurrent or unusual infections that respond poorly to treatment, and are often associated with complications affecting other parts of the body.  Immune deficiency disorders are classified as either primary (congenital) or acquired.  Individuals with immune deficiency disorders also have an increased risk of malignancies and of having autoimmune disorders."  The record in this case clearly reflects that Plaintiff suffered from an immune deficiency disorder.  On March 6, 2007, Dr. McLaughlin noted that on two occasions Plaintiff's immunoglobulins had not responded to immunization, and Dr. McLaughlin diagnosed specific antibody deficiency.  (R. 203).  While Plaintiff's immune deficiency disorder was not actually diagnosed until March 6, 2007, Dr. McLaughlin suspected an immune deficiency disorder at least as early as January 3, 2007, and indicated that the testing done which had confirmed the immune deficiency diagnosis had partially occurred even before that.  (R. 199-200, 203).

In addition to the presence of an immune deficiency disorder, 14.07A requires documentation of one of six specific types of infections.  One such infection which meets Listing 14.07A is "sinusitis documented by appropriate medically acceptable imaging."  The record reflects that, at least as late as February 2007, Plaintiff has displayed symptoms of a sinus infection.  (R. 201).

-17-

Dr. McLaughlin later explained that she had repeatedly treated Plaintiff for chronic sinusitis. (R. 333). Consequently, there does not appear to be any dispute that Plaintiff suffered from sinusitis. The ALJ did, however, note "that the record does not contain any imaging studies documenting the claimant's sinusitis." (R. 19). While the ALJ was technically correct, the ALJ did find that one of Plaintiff's severe impairments was a history of chronic sinusitis. Listing 14.00B explains that for all immune deficiency disorders, "we will make every reasonable effort to obtain your medical history, medical findings, and results of laboratory tests." If the only obstacle to a finding that Plaintiff met Listing 14.07A was a lack of imaging studies which documented Plaintiff's sinusitis, it was incumbent on the ALJ to point this out and provide Plaintiff with the opportunity to provide such medical evidence. Plaintiff has indicated that such imaging study records do, in fact, exist. (Plaintiff's Brief in Support of Complaint at 14 n.5).

Once an individual has demonstrated an immune deficiency disorder and one of the six listed infections, she can meet Listing 14.07 by demonstrating: (1) that the infection is "resistant to treatment;" (2) that the infection required hospitalization; or (3) that the infection required intravenous treatment three or more times in a 12-month period. In this case, there has been no evidence presented indicating that Plaintiff was hospitalized. Therefore, she must demonstrate that her sinusitis was either "resistant to treatment" or required a sufficient number of intravenous treatments. An infection is "resistant to treatment" if it did not respond adequately to an appropriate course of

treatment.[2]  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 14.00C(11).  In recounting Plaintiff's course of treatment in a letter from October 2009, Dr. McLaughlin noted that Plaintiff suffered from chronic sinusitis which was very difficult to treat with multiple courses of antibiotics and other sinus medications until Plaintiff started IVIG.  (R. 335).  And, in fact, in March 2007, Dr. McLaughlin opined that Plaintiff should begin IVIG therapy to try to better control her chronic sinus infections which had not responded to other treatment.  (R. 203).  While Plaintiff's sinusitis does appear to have ultimately responded to the IVIG therapy, the record reveals that those treatments[3] must occur once every four weeks, because the body metabolizes the immunoglobulins, and are going to continue indefinitely.

It, therefore, appears that, as of February 2007, Plaintiff suffered from chronic sinusitis that was resistant to treatment, that was still actively recurring, and that was coupled with an immune deficiency disorder.  As of that time, Plaintiff could have been found to have met Listing 14.07A.  However, the ALJ focused on the fact that Plaintiff had alleged an onset date of January 1, 2008, and concluded that Plaintiff did not meet Listing 14.07A in part because there were no more instances of active sinusitis after the alleged onset date.

---

[2]Listing 14.00C(11) explains that "[w]hether a response is adequate or a course of treatment is appropriate will depend on the specific disease or condition you have, the body system affected, the usual course of the disorder and its treatment, and the other facts of your particular case."

[3]They are quite expensive as well.  There is some evidence that the cost of these treatments costs over $41,000 per year.

This Court is then faced with the issue of what effect the Plaintiff's selection of an "onset date" has upon the ALJ's *disability* decision under the listing.  On one hand, an alleged onset date only affects when an individual can begin receiving DIB.  Plaintiff cannot be paid any benefits prior to January 1, 2008, because she received too much money in 2007 to qualify for benefits and, therefore, engaged in substantial gainful activity during the period.  On the other hand, the ALJ still must look at medical evidence prior to the alleged onset date if such medical evidence supports a finding of disability.[4]  The Seventh Circuit has explained that an ALJ is obligated to consider all of the relevant medical evidence and may not cherry-pick facts to support his decision of non-disability while ignoring relevant evidence that points to a finding of disability.  *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

This Court notes that Listing 14.07 only requires an immune deficiency disorder and an infection that is "resistant to treatment."  Some of the other immune deficiency listings actually require that the specific impairment be "persistent" or "recurrent."  In fact, the Commissioner specifically defined "recurrent" for all immune deficiency disorders to mean "a condition that previously responded adequately to an appropriate course of treatment returns after a period of remission or regression."  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 14.00C(10).  Yet, there is no requirement in Listing 14.07A

---

[4]42 U.S.C. § 423(d)(5)(B) explains that "[i]n making any determination with respect to whether an individual is under a disability . . . the Commissioner of Social Security shall consider all evidence available in such individual's case record . . . ."

that the infection associated with the immune deficiency disorder must be "recurrent." Thus, it is not necessary for Plaintiff to establish "recurrence" under this specific listing. This is in accord with the Social Security regulations which provide that "[t]he Listing of Impairments (the listings) . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). The permanence of a disability is reflected in the explanation that "[m]ost of the listed impairments are permanent or expected to result in death. For some listings, we state a specific period of time for which your impairment(s) will meet the listing. For all others, the evidence must show that your impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months." *Id.* § 404.1525(b)(4). There is no doubt that Plaintiff's immune deficiency disorder (specific antibody deficiency) is permanent; all of the medical evidence of record reflects that it is. The question, then, is: Must the actual infection which is resistant to treatment and is associated with the immune deficiency disorder have to last or be expected to last for a continuous period of at least 12 months? In examining the six listed types of infections, the answer surely must be "no." At least three of the listed infections (pneumonia, endocarditis, and meningitis) are extremely serious infections that could seldom last or be expected to last for a continuous 12-month period.

Therefore, this Magistrate Judge's reading of Listing 14.07A is that once an individual: (a) has an immune deficiency disorder that is permanent; (b) the

immune deficiency disorder is coupled with one of the six listed infections; and (c) the infection is resistant to treatment, then an individual meets that particular listing and does not have to demonstrate that active bouts of meningitis, or sepsis, or endocarditis (or, in this case, sinusitis) *themselves* last for 12 months.

This Magistrate Judge concludes that Plaintiff appears to meet Listing 14.07A because her immune deficiency disorder and sinusitis requires intravenous treatment more than three times a year.  On remand, the ALJ must confirm that there is evidence of appropriate medical imaging to support a diagnosis of sinusitis.

**Issue 2:     Whether the ALJ's RFC assessment took into consideration all of Plaintiff's limitations.**

Plaintiff next raises the issue of whether the ALJ's RFC assessment should have taken into consideration her need to miss work.  Plaintiff's testimony and all of the objective medical evidence reflects that Plaintiff's IVIG treatment was medically necessary, and it would cause Plaintiff to miss work 13 days a year for the actual treatment sessions.  Plaintiff also testified that she was extremely fatigued on the day after the treatment sessions and would be unable to work on those days as well, which is also consistent with the medical evidence and the literature concerning IVIG treatment.  The ALJ, however, did not include the need to miss any work days in his RFC finding.  If, on remand, Plaintiff's impairment is found not to meet or substantially equal Listing 14.07A, the ALJ will still be required to re-evaluate steps four and five of the five-step sequential

evaluation process.  During these steps, the ALJ must include in any hypothetical question to the VE the need to miss at least 13 days of work, and more likely 26 days, unless substantial medical evidence in the record exists showing that those missed days of work for IVIG treatment are not medically necessary.

**Issue 3:      Whether the ALJ mischaracterized the VE's testimony.**

Finally, Plaintiff alleges the ALJ erred by not accurately describing the VE's testimony concerning whether Plaintiff could perform her past work as she actually performed it.  Pursuant to SSR 82-61, the ALJ found that Plaintiff was not disabled because she retained the RFC to perform her past work as an attorney as she actually performed it.  The ALJ indicated that he based this determination on the testimony of the VE, John Grenfell, Ph.D.  The ALJ explained that "Dr. Grenfell's testimony indicates the above residual functional capacity does not preclude work as an attorney as the claimant actually performed it because the claimant worked out of her home, set up her own hours, and worked less than 8 hours per day."  (R. 28)  However, a careful review of the hypothetical question and the VE's response reveals that the VE did not express an opinion regarding whether Plaintiff could perform her past work as she actually performed it.  The VE's full answer to the ALJ's hypothetical question incorporating Plaintiff's RFC was:

> Well, she performed her job working out of her home and setting up her own hours and less than eight hours a day.  I would suggest that she could not do her job as it is generally performed.

(R. 57).

-23-

That response does not specifically address whether Plaintiff can perform her past work as she actually performed it.  The ALJ did not ask any follow-up questions to resolve the discrepancy.  On remand, if the ALJ proceeds to step four of the five-step sequential evaluation process, the ALJ must provide a complete hypothetical question to the VE that includes all of Plaintiffs limitations, and the ALJ must elicit a response from the VE that indicates whether Plaintiff can perform her past work as it was actually performed.

## VII.  Conclusion

The ALJ's decision must be remanded.  The objective medical evidence reveals that Plaintiff's immune deficiency disorder with sinusitis is resistant to treatment and requires 13 IVIG treatment sessions every year.  The Magistrate Judge concludes that Listing 14.07A is likely to be met so long as Plaintiff's sinusitis can be categorized as resistant to treatment even before the alleged onset date of January 1, 2008.  The ALJ must re-contact Plaintiff's treating physician to determine if there are imaging studies that support a diagnosis of sinusitis.  Additionally, if the ALJ determines that Plaintiff does not meet Listing 14.07A because no medical imaging exists, then the ALJ still must proceed to steps four and five of the five-step sequential evaluation process and must include Plaintiff's need for 13 to 26 missed days of work in Plaintiff's RFC.  The ALJ must then determine whether Plaintiff can perform her past work as she actually performed it given her limited RFC.

The final decision of the Commissioner is, therefore, **REMANDED.**

**SO ORDERED** the 17th day of July, 2012.

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Steve Barber
BARBER & BAUER, LLP
steve@barlegal.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov